(PRIZE.)

## The ELEANOR. *Donnell*, claimant.

A libel against the commander of a squadron calling on him to proceed to adjudication, or to make restitution in value, of a vessel and cargo, detained for search by the captain of a frigate belonging to the squadron, and lost while in his possession. Libel dismissed.

The commander of a squadron is liable to individuals for the trespasses of those under his command, in case of positive or permissive orders, or of actual presence and co-operation. But *quære*, how far is he responsible in other cases:

Where *a capture has actually taken place*, with the assent, express or implied, of the commander of a squadron, the prize master may be considered as a bailee to the use of the whole squadron, who are to share in the prize money, and thus the commander may be made responsible; but not so as to mere trespasses, unattended with a conversion to the use of the squadron.

The commander of a single ship is responsible for the acts of those under his command; as are, likewise, the owners of privateers for the conduct of the commanders appointed by them.

To detain for examination, is a right which a belligerant may exercise over every vessel, except a national vessel, which he meets with on the ocean

The principal right necessarily carries with it all the means essential to its exercise; among these may, sometimes, be included the assumption of the disguise of a friend or an enemy, which is a lawful stratagem of war. If, in consequence of the use of this stratagem, the crew of the vessel detained abandon their duty before they are

actually made prisoners of war, and the vessel is thereby lost, the captors are not responsible.

Whenever an officer *seizes, a vessel as prize*, he is bound to commit her to the care of a competent prize-master and crew; not because the original crew, when left on board, (*in the case of a seizure of the vessel of a citizen, or neutral,*) are released from their duty without the assent of the master, but from the want of a right to subject the captured crew to the authority of the captor's officer. But this rule does not extend to the case of a mere *detention for examination*, which the commander of the cruising vessel may enforce by orders from his own quarter deck, and may, therefore, send an officer on board the vessel detained, in order more conveniently to enforce it, without taking the vessel out of the possession of her own officers and crew.

The modern usages of war authorize the bringing one of the principal officers of the vessel detained on board the belligerant vessel, with the papers, for examination.

APPEAL from the circuit court for the district of Massachusetts.

This schooner, with her cargo, the property of the claimant, on a voyage from Baltimore to Bordeaux, fell in with the President and Congress frigates on the night of the 16th October, 1813.

Commodore Rodgers was the commander of the President frigate, and the commodore and commander of the squadron composed of those two ships, then in company. Captain Smith, deceased, and charged in the libel as a co-defendant, commanded the Congress.

On the Eleanor being discovered by the two frigates, she was chased by the Congress and overhaled. The President stood on her course, being out of sight at the time she was overhaled and when she was subsequently dismasted, and so continuing until the signal guns were fired from the schooner. The

master, supercargo, and the officers and crew of the Eleanor, on seeing the frigates, considered them British cruisers, and when they found she could not escape them, concluded they were captured by the enemy. This produced a very general determination, on the part of the crew, to take no further concern in the navigation of the schooner. When boarded by lieutenant Nicholson of the Congress, the schooner was in the state of confusion to be expected from such a determination. He ordered the master to take one of his mates, and his papers, and go on board the frigate. The captain, after giving some orders to his second mate to adjust the sails of the schooner, which were not complied with, went with his first mate and papers, in the frigate's boat, to the Congress. Lieutenant Nicholson, on being asked by a boy what frigate it was, said it was the Shannon; immediately afterwards he undeceived the supercargo, whom he recognised as an old acquaintance, but said he was ordered not to make himself known, and, therefore, requested the supercargo not to disclose it. Upon endeavouring to restore order, and to provide for the safe navigation of the schooner, he could get no assistance from the crew, (who refused to obey his orders, considering him a British officer,) except from the second mate, and on observing this, he disclosed the name of the frigate, and he, the supercargo, and the mate, assuring the crew they were not prisoners, endeavoured to prevail on them to return to their duty; they persisted in refusing; in consequence of which (the sea being tempestuous, and the weather squally) a flaw struck

1817.

The
Eleanor.

the vessel and both her masts went over. Lieutenant Nicholson, the mate, and supercargo, endeavoured to save the vessel, but the crew would not obey either of them. She was afterwards assisted, as far as possible, by the frigates, but finally abandoned and lost.

The libel was filed against commodore Rodgers, and captain Smith, alleging that the loss of said vessel and cargo was owing " to the deception unlawfully practised on her crew by the officers of the said squadron, and through the want of care, inattention, and gross negligence, of the officer of said frigate Congress, in the navigating said schooner, of which he had taken, and then had command," and praying for a monition against them to proceed to adjudication, or to show cause why restitution in value should not be decreed.

The district court considered this allegation supported by the proof, and that commodore Rodgers was answerable, as commander of the squadron, and decreed against him for forty-three thousand two hundred and fifty dollars, the value of said vessel and cargo. The circuit court affirmed the decree pro forma, and thereupon the cause was brought by appeal to this court. After the filing of the libel, and before the decree in the district court, the death of Captain Smith, which had intervened, was suggested on the record.

March 12th.    Mr. *Key,* for the appellant, made three points:

1st. That it was owing to the neglect and misconduct of the captured crew the vessel was lost.

2d. That this neglect and misconduct were in no degree owing to, or palliated by, the military stratagem practised by Captain Smith.

3d. That, at all events, Commodore Rodgers was not responsible in law.

The neglect of the captured crew, in refusing to do duty, is analogous to the case of Virtue v. Bird,[a] where the plaintiff declared that he was employed by the defendant to carry a load of timber from W. to I., to be laid down where the defendant should appoint, and that he carried it; when the defendant, having appointed no place where it should be laid down, the plaintiff's horses were detained in the cold, by which some of them died, and the rest were spoiled; after a verdict for the plaintiff, judgment was arrested; for it was the plaintiff's own fault that he did not take out his horses, and lead them about; or he might have unloaded the timber in any proper place, and returned. So, also, in Butterfield v. Forrester,[b] which was an action on the case for obstructing a highway, by means of which the plaintiff, who was riding along the road, was thrown down with his horse, and injured; it appeared that he was riding with great violence and want of ordinary care, without which he might easily have avoided the obstruction. It was, therefore, decided, that he could not recover; for that two things must concur to support the action: an obstruction in the road by the fault of the defendant, and no want of ordinary care, to avoid it, on the part of the plaintiff. Upon the

a 2 Lev. 196.        b 11 East, 60.

1817.

The
Eleanor.

principle of these cases, the appellant is exempted
from all liability. Nor is he responsible upon the
ground of the liability of a master and principal for
the misconduct of a servant and agent. Superiors
in these relations of life are answerable only for acts
in the ordinary line of the duty of the servant and
agent, or in consequence of the special orders of the
superior. But this principle, with its limitations,
does not apply to the case of a commander of a squad-
ron. He does not elect his officers. They are ap-
pointed by the government, and amenable only to a
court martial. No officer, military or naval, would
undertake so frightful a responsibility; and to im-
pose it upon the commander of a fleet or squadron
would be to incapacitate him from the performance
of his duty. There is no testimony, positive or pre-
sumptive, that Commodore Rodgers gave any orders
whatever to practice the stratagem in question.
The authority of the Mentor[c] shows, that she is not
liable, constructively, for the conduct of the officers
under his command; nor is there any one case to
show that he is thus liable. The Der Mohr[d] is, *ap-
parently* only, such a case. It only proves that a su-
perior officer *may* be placed in the same relation with
that of a principal, in regard to his agent. In that
case, the captors had a right of property in the cap-
tured vessel, inasmuch as by the law of England
captors have the entire interest in prizes; and any
person may be appointed prize-master, and so be-
come the agent of the whole squadron, the comman-

c 1 *Rob.* 179.        d 3 *Rob.* 129.   4 *Rob.* 314,

der of which would, consequently, be responsible. Public policy does not require the establishment of the principle contended for on the other side, since the injured party may have recourse to the actual wrong doer, and may seek redress by complaining to the government of his misconduct.

Mr. *D. B. Ogden*, contra. The case cited from *Levinz* is not parallel; and that from *East* is one of gross folly and want of common prudence and caution on the part of the plaintiff. It is inapplicable, because it was not in the power of the libellant in this case to save his property from destruction. But the present question is not to be determined by the narrow principles of the common law; it is a marine trespass, which must be tried by the more liberal rules of the marine law. The right of visitation and search is not, and cannot be denied; but it is not essentially necessary to the due exercise of the right that the master should be taken out of his vessel: it is only necessary to send a boarding officer to make the proper examination and inquiries; but the belligerant cruisers have no right to proceed further, until they have determined to send in the vessel for adjudication. When this determination is made, a competent prize-master and crew should be put on board, instead of leaving the original crew without control or regulation. A belligerant has a right to practice deception, as a stratagem of war; but this *right*, which may cause a *wrong* to a neutral or fellow citizen, must be exercised at the peril of the captors. Either the seizure of the Elea-

nor was as *prize*, or she was detained for *search*. If the former, then the captors had no right to require the assistance of the crew of the captured vessel,[e] who were not bound to assist in navigating her. If the latter, then the captors had no right to take out the master and mate, leaving the crew without any regular chief competent to navigate the vessel. The case of the Der Mohr was, indeed, determined on general principles of law; on the ground that the prize-master was constituted agent of the captors, and the *vessel* (which was innocent) was used as a vehicle to bring in the *cargo*, which last alone was liable to suspicion. But here the trespass is joint; and the trespassers would have been joint sharers of the prize: *Qui sentit commodum sentire debet et onus.* The President was out of sight at the time of the seizure; but she was present at the inception of the tort. They were cruising in conjunction, and under the orders of Commodore Rodgers, who saw the Congress frigate pursue the Eleanor, and did not prohibit the chase. The boarding officer was a mere passive instrument in the hands of his superiors, to whom alone the injured party can look for indemnification.

Mr. *Harper*, (on the same side.) The responsibility of the owners of privateers and the commanding officers of ships and squadrons, for the misconduct of their delegates, is a settled principle of law. The case of Del Col v. Arnold[f] is in point, where

---

*e* *Wheaton on Capt.* 100.            *f* 3 *Dall.* 333.

this court decreed the owners of a privateer to make resitution in value of a captured vessel lost by the misconduct of the prize-master. The case of the Der Mohr, which has been so often referred to, makes the senior officer responsible for the appointment of a prize-master by his junior officer, though there was no personal misconduct imputable to either. In the case now before the court. the *proximate* cause of the loss was the refusal of the seamen to work. The *ultimate* cause was the deception practised by the captors in representing themselves as enemies; and whether the crew were justifiable in refusing obedience, or not, their disobedience was a consequence of the stratagem practised by the captors, and they are responsible. On the first supposition, they are liable; because they ought to have put a prize crew on board. On the second, because the stratagem was practised at their peril, and it depended upon the event of the search whether they would be justified; for this mode of warfare is not to be practised at the expense of individuals pursuing an innocent and lawful commerce. The case of the Mentor[s] is not. as has been contended, contrary to our position. The claimant there had taken out a monition against the *actual* captor, which had been dismissed; it was, therefore, *res judicata;* and, besides, the lapse of time which had intervened, was held to be an equitable limitation. It is true, that Sir William Scott likewise lays hold of the circumstance that admiral Digby was merely commander of the

1817.

The
Eleanor..

[s] 1 *Rob.* 179.

Y ý

1817.

The
Eleanor.

North American station, and far off at the time when
the capture was made: but here commodore Rod-
gers was present, and associated in the act. The
case of the Charming Betsey shows that innocence
of intention alone in a commanding officer will not
exempt him from the consequences of an illegal act.
In substance and effect, this is a case between the
government and the owner of the property which
has been destroyed, who has become the victim of
a rigorous prosecution of the rights of war and of
military policy. *Respondeat superior!* We pursue
him; let him, in turn, look for indemnification to his
government, to which experience shows that he will
not look in vain.

Mr. *Jones*, for the captors, in reply, argued on the
facts that the loss of the vessel was not a conse-
quence, direct or indirect, of the conduct of the
seizing officer; and that the right of visitation and
search had been properly exercised. It is novel
doctrine, that the *right* of search is to be exercised
under the peril of being responsible for a *wrong*.
Reason, morality, and law, all concur in imposing
the loss (among innocent parties) upon him on whom
the elements and the act of providence throws it.
It was entirely a question of military prudence whe-
ther the papers should be examined by the boarding
officer or by his superior; and there is nothing in
the principles of public law to prevent the exercise
of the right of visitation and search either way.
Neither are the crew of the vessel which is detained

*h* 2 *Cranch,* 64.

for search, exempted from obedience in consequence of the act of boarding. Until the capture is consummated, the former relations of the crew continue; and until then the cruiser is not bound to send on board a competent prize-master and sufficient crew to navigate the captured vessel. The commander of a squadron cannot, on any principle of law or justice, be made responsible, constructively, for the acts of officers on board other ships. The principles and analogies which would make commodore Rodgers a joint trespasser must be those of municipal law. But his was not a civil connection with the officers of the other ship; all that he knew, or permitted, was the chase; and he cannot be made responsible for the subsequent supposed misconduct of his brother officer. Here was a merely military act; no *animus lucrandi*; no appropriation as prize; and, therefore, no civil constructive responsibility. In the case of the Mentor, Sir William Scott expressly overrules the doctrine of the constructive responsibility of a commander in chief; apart from the other grounds of exception, the former adjudication and the lapse of time which he likewise notices. The Der Mohr was a case of joint capture, as expressly stated by the court and the reporter; and was determined on the just principle of joint participation in the wrong done, in the interest acquired by the capture, and in the appointment of the prize-master.

Mr. Justice JOHNSON delivered the opinion of the court.

This case presents two questions, 1st. Are the appellees entitled to recover?

1817.

The
Eleanor.

2. Does their right of recovery extend to the commander of the squadron?

In whatever view the case be considered, it is one of extreme hardship; both the claim and the defence are founded in the most rigid principles of the *strictum jus;* and it is impossible not to regret if the libellant have no means of indemnity, or if that indemnity should be exacted of men whose characters and conduct were so far above all imputation of malice or oppression. Nor can this court altogether close its feelings against the claims to protection of that navy which has so nobly protected the reputation of the country. Yet we mistake the character of the men who constitute it, if they would not be among the first to declare the government unworthy of their skill and valour, in which the rights of the meanest individual was not as much an object of earnest solicitude as the rights of those whom their country delights most to honour. Whether the commander of a squadron be liable to individuals for the trespasses of those under his command is a question on which it would be equally incorrect to lay down a general proposition either negatively or affirmatively. In case of positive or permissive orders, or in case of actual presence and co-operation, there could not be a doubt of his liability. But on the other hand, when we consider the partial independence of each commander of a vessel, and that the association is not a subject of contract, but founded on the orders of their government, which leave them no election, it would be dangerous indeed, and dampening to the ardour of enterprise, to trammel a com-

mander with fears of liability, where it is not possible, from the nature of the service, and the delicate rules of etiquette, for him always to direct or control the actions of those under his command. We feel no inclination to extend the principle of constructive trespass, and will leave each case to be decided on its own merits as it shall arise. Where a capture has actually taken place with the assent of the commodore, express or implied, the question of liability assumes a different aspect; and the prize-master may be considered as bailee to the use of the whole squadron who are to share in the prize money. To this case there is much reason for applying the principle, that *qui sentit commodum sentire debet et onus;* but not so as to mere trespasses unattended with a conversion to the use of the squadron.

The case of the commander of a single ship varies materially from that of the commander of a squadron, and the rigid rules of liability for the acts of those under our command may, with more propriety, be applied to him. The liability of the owners of a privateer for the acts of their commanders has never been disputed. And it is because they are left at large in the selection of a commander, and are not permitted to disavow his actions as being unauthorized by them. So, in the case of a commander of a ship, the absolute subordination of every officer to his command attaches to him the imputation of the marine trespasses of his subalterns on the property of individuals, when acting within the scope of his commands. Orders even giving a discretion to a subordinate in such cases is no more

than adopting his actions as the actions of the commander; and placing him in a command which requires skill, integrity, or prudence, makes the commander the pledge to the individual for his competence to discharge the duties of the undertaking.

With these views of the subject we should have found no difficulty in deciding on the liability of Captain Smith, of the Congress, had he been a party to this libel, and the facts of the case had made out a marine trespass in himself, or in Lieutenant Nicholson, or a want of competence or due care in the latter to discharge the command assigned him. But we are of opinion that no one act is proven in the case which did not comport with the fair, honorable, and reasonable exercise of the rights of war. To detain for examination is a right which a belligerent may exercise over every vessel, not a national vessel, that he meets with on the ocean. And whatever may be the injury that casually results to an individual from the act of another while pursuing the reasonable exercise of an established right, it is his misfortune. The law pronounces it *damnum absque injuria,* and the individual from whose act it proceeds is liable neither at law nor in the forum of conscience. And the principal right necessarily carries with it also all the means essential to its exercise. Thus, in the present case, a vessel must be pursued in order to be detained for examination. But if in the pursuit she had been dismasted, and upset or stranded, or run on shore and lost, it would have been an unfortunate case, but the pursuing vessel would have stood acquitted. The counsel in argument

have not denied the general doctrine, but have endeavoured to show that the commander of the Congress had unreasonably exercised the right of detention.

1st. By the deception, in passing himself off for an enemy, thereby reducing the crew to a state of insubordination.

2d. By taking out both the master and the mate, and thus removing the possibility of bringing the seamen back to their duty.

3d. By devesting the master of his command, without putting a competent crew on board to navigate her.

On the first of these grounds, it is only necessary to remark, that, to assume the guise of a friend or an enemy, is, in legitimate warfare, an act the most familiar and frequent in its occurrence. It is so ordinary a *ruse de guerre*, that it ought rather to be expected than the display of real colours. And, innumerable cases that have come before this court prove, that in the actual state of things during the late war it became as necessary to practice the deception upon our citizens as upon a neutral or an enemy. We, therefore, see nothing reprehensible in this. But on what ground could the crew assume the right of judging for themselves on this subject, and of abandoning their duty before they were actually made prisoners? Suppose the frigate had been an enemy, it did not follow that their vessel must be made prize, and they were unquestionably unpardonable in abandoning their duty? Their doing so, was by no means a necessary consequence

of ordering their officers on board the frigate, nor ought the captain of the Congress to have anticipated such a state of things, as their vessel was reduced to, by their misconduct. They were bound to obey the second mate in the absence of their other officers; and if they had done so, this misfortune would not have happened. So far from actually devesting him of his command, it appears, that Nicholson's orders were addressed to him, and only addressed to the men to try his personal influence in bringing them to order.

To the second and third grounds, the attention of this court has been drawn with peculiar force. Either of them appeared to be an irregularity, which the reasonable exercise of the right of search did not strictly justify. But, upon a close examination of the testimony, we are of opinion, that neither of those grounds is supported by the evidence. It is true, that both the master and first mate were taken on board the frigate, and the master and supercargo say they were both ordered on board. But Nicholson, the boarding officer, who certainly knew best what orders he gave, swears that he ordered the master to go on board with " one of his mates," thus leaving it to his election to choose between them; he farther swears, that these were the orders he received from the captain. And there is a fact in the case, which makes it probable, that the master of the schooner himself called on the first mate to attend him, for at that time the second mate was stationed at the bow, in charge of sinking certain despatches, in case of capture. Had the master re-

monstrated against taking his first mate along with him, he would have done his duty, and perhaps saved his vessel. On the third point, it is unquestionably true, that, whenever an officer seizes a vessel as prize, he is bound to commit her to the care of a competent officer and crew. Not that the original crew, when left on board, in case of seizure of the vessel, of a citizen or neutral, are released from their duty without the assent of the master; for they are bound to attend the vessel, as she may be discharged, and pursue her original destination. But the obligation to man the prize, results from the want of a right to subject the crew of the captured vessel to the authority of his own officer. If, then, this vessel had been seized as prize, and no one put on board but the prize-master, without any undertaking of the original ship's company to navigate her under his orders, it is very questionable whether the appellants would not have been liable for any loss that followed, from the insubordination of the crew. For after capture, as before observed, the prize-master becomes the bailee of the squadron, who are to share in the partition of the proceeds.

But we are of opinion that this was a mere case of detention for search; that the vessel was never actually taken out of possession of her own officers; that the captain of the Congress had a right to detain the vessel by orders from his own quarter-deck, and that the officers of the schooner, at their peril, were bound to obey; that Lieutenant Nicholson was left on board for no other purpose than to enforce, in a more convenient mode, the observance, on their

part, of the duty which the rights of war authorized the frigate to exact of her. And, all the misfortunes which followed resulted to the appellees from the fault or folly of their own crew.

One argument, insisted on at the bar, it is proper for this court to notice before we conclude. It was contended, that the master of the Eleanor ought not to have been removed from his vessel; that the right of search only authorized the sending of an officer on board to examine her papers. But we think otherwise. The modern usages of war authorize the bringing of one of the principal officers on board the cruising vessel, with his papers, for examination. To devest her of both her principal officers, without putting on board her, for the time, a competent officer and crew, would certainly be irregular. But it is for the interest of the commercial world, that the investigation should be made by the commander himself, and not left to any subordinate officer. In that case it would be absurd to require of the commander of the commissioned vessel to quit his command, for the purpose of making the necessary examinations.

We are, upon the whole, of opinion, that the court below erred; that the decree must be annulled, and the libel dismissed.[h]